UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SCHMIDT BROS. FARM LLC,<br><br>Plaintiff,<br><br>vs.<br><br>EDEN SOLUTIONS LLC, SWJ CONSULTING LLC,<br><br>Defendants. | 4:25-CV-04237-RAL<br><br>OPINION AND ORDER DENYING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION |

Schmidt Bros. Farm (Schmidt Farm), a South Dakota limited liability company, sued Defendants Eden Solutions LLC (Eden) and SWJ Consulting LLC (SWJ) in South Dakota state court over damage Eden's products allegedly caused to Schmidt Farm's alfalfa fields in South Dakota. Eden removed the case to this Court and moved to dismiss for lack of personal jurisdiction. Because Eden has the necessary minimum contacts with South Dakota to satisfy due process, this Court denies Eden's motion.

## I. Facts

Schmidt Farm, owned by Josh Schmidt, has a several-thousand-acre alfalfa hay operation in eastern South Dakota.[1] Doc. 1-1 ¶¶ 7, 13; Doc. 12 ¶ 4. At a 2023 agricultural expo, Josh's acquaintance introduced him to Wayne Volkl, the owner of Defendant SWJ. Doc. 1-1 ¶ 13; Doc. 12 ¶ 5. SWJ is an Iowa company that markets and distributes agricultural products to farmers and

[1] This Court refers to Josh Schmidt by his first name to avoid confusion between Josh and Schmidt Farm.

formerly distributed Eden's products. Doc. 1-1 ¶¶ 4, 11; Doc. 9 ¶ 15. Eden is a Missouri LLC with its principal place of business in Wyoming. Doc. 9 ¶¶ 4–5. Eden mainly has warehouses in North Carolina and Oregon; the North Carolina warehouse is non-employee operated while a contracted third party operates the Oregon warehouse. Id. ¶ 7. An affidavit from Nicholas Dresser, Eden's manager, explains that Eden has no physical presence in South Dakota, does not have any employees or agents working in South Dakota, is not licensed to sell products directly to farmers in South Dakota, does not have any products registered in South Dakota, and engages in no for-hire or product advertising in any state. Id. ¶¶ 8–12. Eden sells USDA compliant soil, plant, and animal products to farmers through third-party distributors who sign agreements to distribute Eden's products and then decide whether to recommend and sell Eden's products to their customers. Id. ¶ 6. SWJ ordered products from Eden and stocked them in its facility for resale and self-use but would also occasionally instruct Eden to drop ship orders directly to SWJ's customers. Id. ¶ 16. Eden would bill SWJ based off its distributor price list, and SWJ would then bill its customers under its own billing procedures and price. Id. ¶ 17.

After meeting at the expo, Volkl and Josh had multiple discussions about Josh's desire to increase the yield of Schmidt Farm's alfalfa fields in South Dakota. Doc. 12 ¶ 6. Volkl told Josh that he distributed Eden's products and about results he had seen using the products in Iowa. Doc. 12 ¶ 7. In early September 2023, Volkl emailed Eden employee James Arpin about providing Eden products to Schmidt Farm for use on its alfalfa fields in South Dakota. Doc. 9 ¶ 19; Doc. 9-1. The email asked Arpin to have a conference call with Josh to discuss Eden's products and explained that while Arpin should be "conservative with inputs," Josh had "no problem in spending when the products work." Doc. 9-1. Volkl added that Arpin should "talk about the Base Blends [sic] ability to harvest the early morning dew" as this "would be HUGE in SD & NE." Id.

Dresser's affidavit states that SWJ arranged a conference call with Volkl, Josh, and Arpin to broker a deal between SWJ and Schmidt Farm. Doc. 9 ¶¶ 20–21. This conference call was Eden's first direct interaction with Schmidt Farm. Id. ¶ 21. Volkl emailed Arpin again in October 2023 about making recommendations to Josh for Schmidt Farm's fields. Doc. 9 ¶ 22; Doc. 9-2. In December 2023, Volkl forwarded Josh an email exchange he had with Arpin saying SWJ had tentative sales of Eden's products in South Dakota. Doc. 12 ¶ 8; Doc. 12-1. Volkl wrote in the email to Arpin that getting "the product on as many acres as possible next spring will be instrumental in growing future sales in 24 & 25." Doc. 12-1 at 4.

Josh had several phone calls with Arpin after Volkl introduced them. Doc. 12 ¶ 10. Arpin, whom Josh viewed as the "brain" behind Eden, tried to persuade Josh to purchase Eden's products. Id. ¶¶ 9–10. He explained that Eden's products could increase the yields from Schmidt Farm's alfalfa fields by improving soil quality and that using the products would make insecticide unnecessary. Id. ¶ 10. Arpin also asked Josh to send him crop and soil samples so that Eden could have apical tests run to determine which products to recommend for Schmidt Farm's fields. Id. ¶ 11. Josh spoke with Arpin approximately six times before purchasing any Eden products, with some of these phone conversations lasting an hour. Id. ¶ 10.

Volkl emailed Arpin in early January 2024 asking to set up a phone conference with Volkl, Arpin, Josh, and another farmer in South Dakota interested in buying Eden's products. Doc. 9 ¶ 23; Doc. 9-3. Volkl wrote that Josh and the other South Dakota farmer were "Market Influencers" and "walking billboards of advertising." Doc. 9-3. He added that the Interstate 29 corridor of South Dakota and the surrounding states have "millions of acres of hay production" and that Sioux Falls, South Dakota, where Josh and the other farmer were based "seems to be the epicenter." Id. Later that month, Arpin emailed Josh links to the results from the apical tests on

the samples from Schmidt Farm's fields. Doc. 12 ¶ 11; Doc. 12-2. Relying on the tests, Arpin emailed Josh in March 2024 recommending certain Eden products for use on Schimdt Farm's fields. Doc. 12 ¶¶ 13–14; Docs. 12-3, 12-4. Arpin wrote that Eden had spoken with Volkl and that "we" would be offering Schmidt Farm a 20% discount. Doc. 12 ¶ 13; Doc. 12-3.

Josh emailed Arpin on April 1, 2024, saying that Schmidt Farm planned to purchase Edens' products based on Arpin's recommendations. Doc. 12-5 at 2; Doc. 12 ¶ 16. According to Josh, Schmidt Farm would probably not have made the purchase without Arpin's representations about Eden's products. Doc. 12 ¶ 15. Arpin thanked Josh for the order and explained that billing for the products would come through Volkl at SWJ. Doc. 12-5 at 1. Arpin wrote that Josh would see a slight increase in price from the initial estimate because Arpin had to "update the powders to full bags on the order." Id. Schmidt Farm then purchased the Eden products through a purchase order with SWJ. Doc. 1-1 ¶ 18; Doc. 9 ¶ 24; Doc. 9-4. Schmidt Farm did not pay Eden directly for the products, but paid SWJ who then paid Eden. Doc. 9 ¶ 26. Eden emailed Josh several times about the shipping process before sending the products from its warehouse in North Carolina to Schmidt Farm in South Dakota. Doc. 12 ¶ 17; Docs. 12-6, 12-7, 12-8, 12-9. Dresser believes this was the first time Eden's products were provided by a distributor operating in South Dakota or to a farm in South Dakota. Doc. 9 ¶ 14.

Arpin remained in contact with Josh after Schmidt Farm received Eden's products, counseling him on the phone about how to mix the products and emailing a recommendation about spraying equipment. Doc. 12 ¶¶ 19–20; Docs. 12-11, 12-12. Shortly after applying Eden's products, Schmidt Farm discovered that its alfalfa fields were destroyed by what appeared to be a weevil infestation. Doc. 12 ¶ 21. Josh notified Volkl, who in turn notified Arpin. Id. ¶ 22; Docs. 12-13, 12-14; Doc. 9 ¶ 27. Arpin emailed Josh and Volkl twice on May 18, 2024, providing his

thoughts on what was happening with Schmidt Farm's fields and what might be done to fix them. Doc. 12 ¶ 23; Docs. 12-14, 12-15. Arpin called Josh that same day for details about the problem and to request pictures of the fields. Doc. 12 ¶ 24. Josh explained that Schmidt Farm needed to act quickly by either spraying the fields with insecticide or cutting the hay so that the weevils did not completely destroy the alfalfa and ruin future cuttings. Id. ¶ 25. Arpin, however, argued against spraying insecticides so that tests could be run to determine what was wrong. Id. He also explained that Eden would send a natural detox product that could be used on Schmidt Farm's fields instead of insecticide. Id. Josh agreed to use Eden's detox product rather than insecticide, and a sample from Schmidt Farm's fields was sent for testing. Id. ¶¶ 26, 28.

Eden informed Josh in a May 21, 2024 email that it was sending 100 gallons of a product Arpin had made for Schmidt Farm's fields. Doc. 12 ¶ 27; Doc. 12-17. A few days later, Arpin emailed Josh and others the test results and said he would like to speak with Josh to discuss the next steps. Doc. 12 ¶ 30; Doc. 12-19. When Arpin and Josh spoke on the phone, Arpin recommended another Eden product to fix Schmidt Farm's fields. Doc. 12 ¶ 31. Eden shipped the product to Schmidt Farm on May 31, 2024. Doc. 12 ¶ 31; Doc. 12-20; Doc. 9-5. Arpin wrote in an email to Josh that "[a]dditional discounts" would apply to the order. Doc. 12-21. All the products Schmidt Farm received from Eden bore Eden's logo or the "Blue Gold" logo, which is a Eden line of products. Doc. 12 ¶ 35; Doc. 12-23. Arpin and Josh had other phone calls around this time and Arpin sent two additional emails explaining the Eden products and how to apply them. Doc. 12 ¶¶ 32–34; Docs. 12-21, 12-22. Arpin informed Josh that he planned to come to South Dakota to view Schmidt Farm's fields but did not show up on the planned date. Doc. 12 ¶ 33. Schmidt Farm alleges that the products Eden sent failed to fix the problems and that its alfalfa fields were severely damaged and had a reduced yield. Doc. 1-1 ¶¶ 29–31.

Schmidt Farm sued Eden and SWJ in South Dakota state court in fall 2025. Doc. 1-1. Schmidt Farm alleged that Eden breached the parties' contract by failing to provide an alfalfa product that performed as agreed upon (Count I), made negligent misrepresentations about the alfalfa product (Count II), made negligent misrepresentations about the detox and corrective products Schmidt Farm used on its alfalfa fields after the weevil infestation (Count III), was negligent in recommending, preparing, and furnishing its products to Schmidt Farm (Count IV), and breached implied and express warranties to Schmidt Farm (Count VI).[2] Doc. 1-1. Eden removed the case to this Court and moved to dismiss under Federal Rule of Civil Procedure 12(b)(2), arguing that it lacks the minimum contacts with South Dakota necessary for personal jurisdiction. Docs. 7, 8.

## II. Standard of Review

The showing a plaintiff must make when the defendant contests personal jurisdiction under Rule 12(b)(2) depends on the stage of the case and the method the court employs to resolve the jurisdictional dispute. See K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 591–92 (8th Cir. 2011); Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). At trial or after an evidentiary hearing, the plaintiff must prove personal jurisdiction by a preponderance of the evidence. Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015). But when, as here, the court limits its review of a Rule 12(b)(2) motion solely to affidavits and other written evidence, the plaintiff "need only make a prima facie showing of [personal] jurisdiction." Dakota Indus., 946 F.2d at 1387. "Although the evidentiary showing required at the prima facie stage is minimal, the showing must be tested, not by the pleadings

---

[2]SWJ has yet to appear before this Court and it is unclear whether they have been served. Doc. 1 ¶ 2.

alone, but by the affidavits and exhibits supporting or opposing the motion." K-V Pharm. Co., 648 F.3d at 592 (cleaned up and internal marks and citations omitted). This Court construes the materials filed in the light most favorable to Schmidt Farm and resolves all factual disputes on jurisdictional issues in its favor. Id.

## III. Analysis

A federal court sitting in diversity may exercise jurisdiction over nonresident defendants only if both the forum state's long-arm statute and the Fourteenth Amendment's Due Process Clause are satisfied. Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). Because South Dakota's long-arm statute confers jurisdiction to the full extent permissible under the Due Process Clause, the question here is whether asserting personal jurisdiction over Eden comports with due process. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994) (applying South Dakota law).

Personal jurisdiction under the Due Process Clause may be either general or specific. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924–25 (2011). Courts with general jurisdiction over a defendant may hear "any and all claims" against the defendant, even if those claims are unrelated to the defendant's contacts with the forum state. Daimler AG v. Bauman, 571 U.S. 117, 127 (2014) (quoting Goodyear, 564 U.S. at 919). For general jurisdiction to exist, the defendant's contacts with the forum state must be "so 'continuous and systematic'" that the defendant is "essentially at home" there. Goodyear, 564 U.S. at 919 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Eden's contacts with South Dakota fall short of the sort of continuous and systematic presence necessary for general jurisdiction, and Schmidt Farm doesn't contend otherwise. Specific jurisdiction, by contrast, may be based on a defendant's solitary or irregular contact with the forum state. Daimler, 571 U.S. at 127. Unlike general

jurisdiction, however, specific jurisdiction is limited to suits arising out of or relating to the defendant's contact with the forum state. Goodyear, 564 U.S. at 919.

Courts may exercise specific jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts" with the state such that having to defend a lawsuit there "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 316 (quotation omitted). These minimum contacts must be based on "some act by which the defendant purposefully avails" himself of the forum state, "such that he should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474–75 (1985) (quotations omitted). It is the defendant, rather than the plaintiff or a third party, who must establish the minimum contacts in the forum state. Walden v. Fiore, 571 U.S. 277, 284 (2014). Moreover, the defendant's contacts must be "with the forum State itself, not . . . with persons who reside there." Id. at 285; see also id. at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting Burger King, 471 U.S. at 475)).

Under Eighth Circuit precedent, five factors guide evaluating whether the constitutional requirements for personal jurisdiction have been met: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action to these contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd., 89 F.3d 519, 522–23 (8th Cir. 1996) (footnote omitted). The first three factors are the most important while the last two are secondary. Id. at 523. Courts analyze personal jurisdiction on a claim-by-claim basis. Vallone v. CJS Sols. Grp., 9 F.4th 861, 865 (8th Cir. 2021); see also Phillips

Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999) (commending district court for analyzing tort and breach of contract claims discretely).

Schmidt Farm has made a prima facie showing that South Dakota has personal jurisdiction over Eden for all five claims.[3] Eden employee Arpin, whom Josh viewed as the "brain" behind Eden, persuaded Josh to purchase Eden's products during their phone calls and emails. Doc. 12 ¶¶ 10, 15. Arpin's representations about what Eden's products could do were critical to Josh's decision to buy the products for Schmidt Farm's alfalfa fields in South Dakota. Id. ¶ 15. Arprin did not just make generic recommendations to Josh but rather used the crop and soil samples Josh sent from Schmidt Farm's South Dakota fields to recommend specific Eden products. Doc. 12 ¶¶ 11, 13; Docs. 12-3, 12-4. Though Schmidt Farm purchased the products through an order with SWJ, Eden exercised at least some control over the price Schmidt Farm paid and the amount of product Eden sent, telling Josh in a March 2024 email that Eden was offering him a 20% discount and then increasing the powder Eden was sending for Schmidt Farm to full bags. Doc. 12 ¶¶ 13, 16; Docs. 12-3, 12-5; see Chea v. Fette, No. Civ.A. 02-8667, 2004 WL 220866, at *3 (E.D. Pa. Jan. 7, 2004) (finding specific jurisdiction in part because defendant approved the terms of payment for the sale of its product through a distributor). Eden also shipped its products directly to Schmidt Farm in South Dakota rather than sending them to SWJ in Iowa. Doc. 12 ¶ 17; see Walden, 571 U.S. at 285 (explaining that "physical entry into the State—either by the defendant

---

[3] Schmidt Farm's personal jurisdiction argument relies in part on Eighth Circuit cases applying a version of the stream-of-commerce doctrine. The Eighth Circuit has recognized "a variant of stream-of-commerce jurisdiction over a foreign manufacturer that pours its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area." Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 597 (8th Cir. 2011) (cleaned up and citation omitted). This case involves a defendant's direct contact with the forum state and a forum state resident rather than a situation where the defendant poured its product into a discrete market but left most everything else to a distributor.

in person or through an agent, goods, mail, or some other means—is certainly a relevant contact" when analyzing personal jurisdiction); see also K-V Pharm. Co., 648 F.3d at 594 ("A delivery term that requires a nonresident defendant to deliver an item to a plaintiff in the plaintiff's forum state supports the existence of personal jurisdiction over the nonresident defendant."). Beyond that, Eden provided customer support to Schmidt Farm in South Dakota after shipping the products, and the weevil infestation caused harm to Schmidt Farm in South Dakota. Doc. 12 ¶¶ 19–20; Doc. 12-12. These contacts with South Dakota are enough for a prima facie showing of personal jurisdiction over Schmidt Farm's claims that Eden made negligent misrepresentations about the alfalfa product (Count II) and breached the parties' contract by failing to provide an alfalfa product that performed as agreed upon (Count I).

The same is true for Schmidt Farm's claims that Eden made negligent misrepresentations about the detox and corrective products Schmidt Farm used on its alfalfa fields after the weevil infestation (Count III), that Eden was negligent in recommending, preparing, and furnishing its products to Schmidt Farm (Count IV), and that Eden breached express and implied warranties to Schmidt Farm (Count VI). Eden continued to direct its conduct towards South Dakota after the weevil infestation. Arpin called and emailed Josh about fixing Schmidt Farm's fields, analyzed tests run on samples from the fields, and convinced Josh to apply an Eden detox product to the fields rather than spraying insecticide or cutting the hay like Josh wanted. Doc. 12 ¶¶ 23–26, 28–30, 32; Docs. 12-14, 12-15. Arpin made the detox product specifically for the "issues" in Schmidt Farm's South Dakota fields, and Eden sent the product to South Dakota. Doc. 12 ¶ 27; Docs. 12-17, 12-19; see Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112 (1987) (plurality opinion) (explaining that designing a product for the market in a forum state "may indicate an intent or purpose to serve" that market). Upon receiving the test results from Schmidt Farm's

fields, Arpin recommended yet another Eden product for use in South Dakota. Doc. 12 ¶¶ 30–31. Like the other products, Eden shipped this corrective product directly to Schmidt Farm in South Dakota and provided instruction on how to apply it. Doc. 12 ¶ 31; Doc. 9-5; Docs. 12-20, 12-21, 12-22. Eden purposefully established significant contacts with South Dakota by convincing a South Dakota farming business to use Eden's products on its fields, using samples from the fields to recommend and formulate Eden products for use in South Dakota, and shipping three loads of product directly to South Dakota. Given these contacts, Eden could reasonably anticipate being sued in South Dakota.

Eden makes three main arguments against personal jurisdiction, but none are persuasive. Eden argues first that the initial sale of products for Schmidt Farm's alfalfa fields is akin to the single online sale the Eighth Circuit found insufficient for personal jurisdiction in Brothers and Sisters in Christ v. Zazzle, Inc., 42 F.4th 948 (8th Cir. 2022). See id. at 953 (explaining that the Supreme Court "has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant" (cleaned up and citation omitted)). The defendant in Zazzle sold and shipped a single trademark-infringing t-shirt to a Missouri resident affiliated with the plaintiff. Id. at 950–51. Though the defendant operated a nationally available website, it did not specifically target Missouri or Missouri consumers. Id. at 954. The Eighth Circuit found personal jurisdiction lacking because the defendant had only made one sale to a Missouri resident and had not taken any purposeful action towards Missouri or its residents. Id. at 953–54. Eden's purposeful, targeted action towards South Dakota makes this case different from Zazzle. Unlike in Zazzle, Eden convinced a company in the forum state to apply Eden's products on fields in South Dakota, tailored its recommendations to the company based on tests from these fields, provided customer service to help the company apply the product, and then

convinced the South Dakota customer to use another product once problems surfaced after the initial product's use. This goes far beyond operating a nationally available website from which a forum resident happened to order a t-shirt.

Eden argues next that neither the nature nor the quantity of its contacts with South Dakota support personal jurisdiction. Eden points out that it has no employees in South Dakota, does not advertise there, is not licensed to sell products there, and has no physical presence there. Eden adds that Schmidt Farm bought the alfalfa product through a purchase order with SWJ and paid SWJ rather than Eden. Any contacts with South Dakota, Eden contends, arise from the interactions between SWJ and Schmidt Farm. Eden's arguments overlook the evidence Schmidt Farm submitted which must be viewed in the light most favorable to the nonmoving party at this stage of the case. Eden did not simply answer a few questions about its product and then fulfill an order placed by a distributor. Rather, Eden's employee Arpin had approximately six phone calls with Josh—some of which lasted an hour—during which he tried to persuade Josh to use Eden's products on Schmidt Farm's fields in South Dakota. And it was Eden—not SWJ—that recommended products for use in South Dakota based on soil and field samples, told Josh that he was receiving a 20% discount, increased the amount of product being sent, and counseled Josh about applying the alfalfa products and what to do and apply once a weevil infestation occurred. The nature and quality of Eden's contacts with South Dakota support finding personal jurisdiction.

Eden's last argument is that the events after Schmidt Farm's initial injury from applying the alfalfa product are irrelevant to analyzing personal jurisdiction. But this ignores Counts III, IV, and VI of Schmidt Farm's complaint. These counts allege damage from the detox and corrective products Eden sent and Eden's alleged misrepresentations about these products. Eden's

conduct after the initial injury is relevant to Counts III, IV, and VI and may properly be considered at least when analyzing whether personal jurisdiction exists over Eden for these counts.

Viewing the evidence in the light most favorable to Schmidt Farm, Schmidt Farm has made a prima facie showing that Eden has the minimum contacts with South Dakota required by due process. Eden purposefully availed itself of the privilege of conducting activities within South Dakota by convincing a South Dakota farming company to apply Eden's products on its fields, using samples from these fields to recommend and formulate Eden products for use in South Dakota, shipping three loads of products directly to South Dakota, and providing support and advice on the products' use in South Dakota. Schmidt Farm's claims against Eden arise directly from Eden's contacts with South Dakota and South Dakota clearly has an interest in providing a forum to Schmidt Farm. Though litigating in South Dakota might be inconvenient for Eden, its contacts with South Dakota were such that it could reasonably anticipate being haled into court there. Exercising personal jurisdiction over Eden comports with fair play and substantial justice.

## IV. Conclusion

For the reasons stated above, it is

ORDERED that Eden's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2), Doc. 7, is denied.

DATED this 1st day of September, 2026.

BY THE COURT:

Roberto A. Lange

ROBERTO A. LANGE
CHIEF JUDGE